Filed 11/19/14  P. v. Wiggins CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C071601 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-111432) |
| v. | |
| DAVID EARL WIGGINS, | |
| Defendant and Appellant. | |

Defendant David Earl Wiggins appeals from a judgment of conviction following a jury trial.  Defendant was convicted of mayhem (Pen. Code, § 203 (count 1)) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) (count 3)).  The jury found true an allegation that he caused great bodily injury (Pen. Code, § 12022.7, subd. (a)), and the trial court found true an allegation that defendant served a prior prison term (Pen. Code, § 667.5, subd. (b)).  Defendant was sentenced to a total of nine years.

On appeal, defendant contends that:  (1) the trial court abused its discretion in admitting uncharged misconduct evidence of prior assaults because the probative value of the evidence was substantially outweighed by its prejudicial effect and the presentation of

1

the evidence required a time-consuming "mini-trial" of the uncharged offenses, which confused the jurors and tempted them to punish defendant for his past conduct; and (2) the abstract of judgment should be amended to reflect the trial court's order that a previously ordered restitution payment to the victim be held in abeyance so the victim could obtain compensation from the California Crime Victim Compensation Program (VCP). The People contend that the court did not err in admitting the uncharged misconduct evidence because the evidence was highly probative of defendant's intent and motive to rule the apartment building by force, and the evidence also refuted defendant's self-defense theory. Additionally, the People argue that the evidence did not consume an undue amount of time or confuse the jury because the prosecution witnesses' testimony about the uncharged misconduct "was contained in 32 pages of transcript, and according to the clerk's minutes consumed only about an hour" of trial time. As for the abstract of judgment, the People agree that it must be amended to reflect the trial court's order that the victim's restitution be held in abeyance in order for victim to seek funds from the VCP.

We conclude that the trial court did not abuse its discretion in admitting the evidence of the prior assaults to establish intent and motive, and even if the court did err, any error was harmless. We remand this case for a restitution hearing so the trial court can determine whether the VCP distributed funds to the victim and if so, order defendant to reimburse the VCP, or reinstate its original order if VCP declined the victim's claim or the victim never applied for funds from VCP. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charged Offenses and Allegations

Defendant was charged in a First Amended Information with mayhem (Pen. Code, § 203 (count 1)), possession of a deadly weapon, a billy (Pen. Code, § 22210 (count 2)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) (count 3)), and battery with

2

serious bodily injury (Pen. Code, § 243, subd. (d) (count 4)).  The victim was Scott

Homestead.  In connection with count three, the information alleged that defendant

personally inflicted great bodily injury on Homestead (Pen. Code, § 12022.7, subd. (a)).

The information also alleged that defendant was on bail or his own recognizance in

another case at the time of the crimes charged here within the meaning of Penal Code

section 12022.1, subdivision (b), and that defendant  had suffered three prior felony

convictions for which he had served prison terms.  (Pen. Code, § 667.5, subd. (b).)

Prior to trial, the court granted the People's motion to dismiss two of the three

prison prior allegations, and defendant admitted the third alleged prison prior.  The

parties also stipulated that Homestead suffered great bodily injury within the meaning of

Penal Code section 12022.7, subdivision (a).  The bail enhancement allegation was

dropped some time before the trial, although it is not clear from the record when this

occurred.

### Prosecution Evidence

Homestead testified that on January 20, 2012, around 7:00 p.m., he went to the

Basic Apartments to help his friend's girlfriend, Melanie Sewell, and her friend, Dana

Snyder, move some belongings.  Rebecca Christensen, a building employee who knew

both defendant and Sewell, testified that the two dated at one point, and Sewell had spent

nights at defendant's apartment.  Christensen explained that Snyder was a friend of both

Sewell and defendant, and Snyder also stayed overnight at defendant's apartment at some

point before the charged offenses.

When Homestead, Sewell and Snyder arrived at the apartment building, they went

upstairs to the second floor hallway[1] where the two women began gathering a few boxes

and other personal property that was in the hallway.  While Homestead was waiting in the

---

[1] There was a music club on the first floor of the building.  On the second floor, there
were five or six apartments.

hallway, he stood approximately 15 feet from defendant's apartment door. Homestead testified that he had been there less than a minute when defendant came out of his apartment, quickly approached him with a metal object that looked similar to a golf club, and struck him in the face. Homestead had never seen defendant before and did not see him approaching until just before he was struck. Homestead was unarmed and had not exchanged words with defendant prior to the sudden attack. After defendant struck Homestead in the face the first time, Homestead turned and tried to block additional blows. Defendant struck Homestead a second time in the face and once on the left triceps. As defendant hit Homestead with the metal bar, defendant was yelling "something about knocking on walls or something like that." Homestead immediately noticed blood pouring from his mouth and felt one of his front teeth lodged in his pallet.

Homestead retreated down the stairs to his truck and attempted to drive himself to a hospital. When he felt that he was going to pass out, he pulled over at a Dairy Queen and called 911. From there, Homestead was taken by ambulance to a nearby hospital where physicians determined that he lost five teeth and needed bone grafts, which "did not take." Two other teeth had to be wired together. The next day, a straight line bruise appeared on Homestead's left triceps. As a result of the attack, Homestead lost 25-30 pounds by the time of trial because he was not able to chew food normally.

Roseville Police Department Officer Rodney Reno responded to Homestead's 911 call and interviewed him while he was inside the ambulance in the Dairy Queen parking lot. Officer Reno testified that it was difficult to talk to Homestead because there was "a lot of blood coming from his mouth." Despite the fact it was difficult for Homestead to speak, he related to Officer Reno a physical description of his attacker and said that he did not know the man. Officer Reno spoke with Homestead again later that night at the hospital, and Homestead provided more information about the assault and its location. Around that time, the police received a call from a witness who related more information about the location of the apartment building, the suspect, and his apartment number.

Officer Reno then went to the Basic Apartments to secure the scene and question defendant.  He went up the stairs and saw fresh blood drops on the floor in the hallway in a trail ending near defendant's apartment.  Officer Reno then knocked on defendant's door and asked whether he had been involved in an altercation earlier that night.  Defendant told the officer that somebody was banging on the walls, so he opened the door and hit the man in the mouth with his fist.  Defendant did not mention that the man he hit had a weapon or threatened him in any way; nor did he say that he feared for his own safety during the altercation.  In response to Officer Reno's questioning, defendant denied having a weapon.  The officer inspected defendant's hands and wrists for signs that he had struck someone with his fists as he had described, but his hands appeared normal.

While Officer Reno detained defendant, another officer searched defendant's apartment and did not find a golf club but found and seized a metal rod or club near the door and a metal baseball bat.  These two objects were the only objects in defendant's apartment that the officers found to be consistent with Homestead's description and his injuries.  Following the search, Officer Reno arrested defendant.

Officer Reno also testified that he reviewed the Basic Apartments' security video of the assault.  The video recording was shown to the jury.  The video first shows the two women and Homestead enter the hallway.  Homestead appeared to be casually fidgeting in the hallway while he waited for Snyder and Sewell to gather their things.  Approximately 12 seconds later, Homestead briefly stretched his arms between the walls in the hallway and quickly tapped his fingers on the walls as he stretched.   The video does not show Homestead banging on the walls at any time.  Approximately 18 seconds after Homestead entered the hallway, he stood with his back to the wall and adjusted his

5

sweatshirt. A few seconds later[2] defendant emerged from his apartment. The video does not show Homestead saying anything to defendant before the assault nor does it show him holding a weapon. It does show defendant moving quickly toward Homestead and striking him repeatedly. Approximately three seconds later, Homestead fled and defendant chased him a few steps. Homestead was only in the hallway a total of approximately 30 seconds.

We discuss the prosecution's uncharged misconduct evidence, *post*.

**Defense Evidence**

Defendant testified in his own defense. He testified that on the night of the incident, he left Snyder's personal property in the hallway outside his apartment door because he did not want her to stay with him any longer. Earlier that day, defendant sent a text message to Sewell asking her to tell Snyder to come pick up her things. By the late afternoon, Snyder's things were still in the hallway. Defendant went to bed early that evening because he had to work early the following morning. At approximately 7:00 p.m., defendant heard yelling outside his apartment that woke him, and he then heard loud knocking on his door. Defendant went to his door, looked through the peephole, and saw Sewell and Snyder gathering the items in the hallway. Defendant testified he was about to open the door to speak with the women but then observed Homestead through the peephole, who he did not recognize, looking around suspiciously and reaching behind as if he was reaching for a weapon. Defendant decided to watch Homestead for a moment, and he then heard a banging sound on his wall, saw the Homestead's hands moving toward the wall, and assumed it was Homestead causing the noise.

---

[2] The view of defendant coming into the hallway is somewhat obstructed, but it appears defendant emerged three to eight seconds after Homestead stood against the wall.

Defendant testified that Sewell then called to him, saying that she could hear him behind his door. Defendant opened the door to talk to Sewell and Snyder, and he observed Homestead, who had his back to a wall in the hallway, look in his direction. Defendant asked Homestead what he was doing and told him to stop banging on his wall. Defendant testified that he feared Homestead had a weapon, so he grabbed the metal bar that was near the door and instructed Homestead to put his hands in his pockets. Defendant again asked Homestead why he was pounding on his wall, and Homestead suddenly jerked his hands out of his pockets and threatened to "kick [defendant's] ass." Defendant testified he was "scared to death" because he thought that Homestead had a knife in one hand, and he felt he had nowhere to run because Homestead was only a few feet away. Because he felt threatened and trapped, he "instinctively" approached Homestead, "tapped" him on the leg with the bar "as a warning," and told him not to reach for the knife. When he saw Homestead begin to reach for something, he struck again. Homestead then ran down the stairs and defendant followed after him a few steps, warning him not to come back.

On cross-examination, defendant admitted that he was not sure that Holmstead had a knife in his hand and that he never mentioned seeing Holmstead with a knife in his earlier accounts of the altercation. Defendant also admitted that he did not call 911 to report the incident, and when Officer Reno questioned him later that evening, he told the officer that he may have hit Homestead with the heel of his hand or fist.

We discuss defendant's testimony regarding the uncharged misconduct evidence, *post*.

Christensen was recalled to testify on behalf of defendant, and she stated that Snyder returned to the apartment building after defendant was arrested and entered defendant's apartment with a key, retrieving her remaining belongings.

7

### Verdicts and Sentencing

The jury returned verdicts of guilty of count one, mayhem, and count three, assault with a deadly weapon, and it found the great bodily injury enhancement true. The jury found defendant not guilty of count two, possession of a deadly weapon, a billy. The prosecutor later moved to dismiss count four, battery with serious bodily injury, which the court granted.

On July 3, 2012, the court sentenced defendant to prison as follows: (1) on count one, mayhem, a term of eight years plus one year for the prison prior enhancement; and (2) on count three, a term of four years plus three years for the great bodily injury enhancement. The court stayed the sentence on count three pursuant to Penal Code section 654. We discuss victim restitution, *post*.

## DISCUSSION

### I.  Admissibility of Uncharged Misconduct Evidence

#### A.  Background

#### Pretrial Proceedings

Pursuant to Evidence Code section 1101, subdivision (b),[3] the prosecution sought to present the testimony of four witnesses and a brief video depicting similar recent uncharged misconduct: (1) On November 15, 2010,[4] defendant assaulted a manager of the apartment building, Mark Lehr, after getting into a verbal altercation with another manager (the "Lehr assault"); and (2) on January 18, 2012, Christensen observed that a

---

[3] Undesignated statutory references are to the Evidence Code in effect at the time of the charged offenses.

[4] Although the prosecutor mistakenly referenced another date, October 2011, in some of his questioning about the Lehr assault and at other times referenced November 2010, the security video depicting this incident is dated November 15, 2010.

visitor she knew as "Billy" had fresh injuries to his face,[5] and upon reviewing the building's surveillance footage, found that it showed defendant striking Billy outside defendant's apartment door (the "Billy assault").

In its written motion, the prosecution argued that the uncharged crime evidence established defendant's intent and showed that defendant "was motivated by a desire to rule Basic Apartments by violence." Thus, according to the prosecution, the evidence that defendant "violently attacked and injured people without provocation" in the apartment building was admissible under section 1101, subdivision (b), to establish his intent and motive to cause Homestead harm in the instant case.

Before empanelling the jury, the court heard oral argument on the prosecution's uncharged misconduct motion. The prosecution argued that the evidence proved defendant's intent and motive because both incidents were extremely similar unprovoked assaults in the hallway outside defendant's apartment and occurred close in time to the charged offense. The prosecution asserted, "There is a pattern of conduct that this Defendant intends to cause individuals harm and is motivated to cause them harm within the Basic Apartment[s] Complex. Given the extreme similarity between those assaults and the unprovoked assault in the current case, the People intend to admit it pursuant to [section] 1101(b) as motive and intent."

In response, defense counsel argued that the video of defendant striking Lehr appeared to depict "a mutual fight" that did not involve weapons and was thus dissimilar to the charged offense. The defense contended that if the court admitted evidence of this instance of uncharged misconduct, "we end up having [] a full other trial, very confusing for the jury, not to mention the prejudice to my client." Additionally, defense counsel contended that the Billy assault was problematic because Billy did not make a police

---

[5] Christensen made efforts to ascertain Billy's last name but did not discover it.

report and was not testifying; the evidence of this incident was wholly based on Christensen's testimony from her review of the video footage.

After hearing argument, the trial court ruled that the prosecutor could introduce the two instances of uncharged misconduct to prove defendant's intent and motive. The court reasoned that the Lehr assault evidence was relevant to show intent and motive, and it had "not heard sufficient evidence to show that the incident would be unduly cumulative or prejudicial in its effect and…that the prejudicial effect would outweigh the potential probative value." Additionally, the court reasoned that the Billy assault was not only similar but very recent, only two days before the charged offense, and was thus particularly probative of intent and motive under section 1101, subdivision (b), as long as the prosecutor laid the proper foundation. However, the court reminded the defense that it could "object as it sees fit depending on how the evidence comes out in court." Defendant made no further objection during the trial.

## Uncharged Misconduct Trial Evidence

### The Lehr Assault

The prosecution presented the testimony of three witnesses as well as a security camera video to establish the Lehr assault. Michael Rapport, the owner of the Basic Apartments, testified that in November 2010, he went to defendant's apartment to discuss defendant's noise complaints about the bar downstairs. The conversation began in defendant's apartment, but Rapport felt safer moving to the hallway as defendant grew increasingly agitated. As defendant began yelling, Paul Clark, the general manager, intervened and defendant directed his anger toward Clark. Clark testified that he unsuccessfully attempted to calm defendant and then called Lehr to assist him. Both Rapport and Clark testified that shortly after the call, Lehr arrived at the scene and briefly exchanged words with defendant before turning away or walking past defendant. Defendant punched Lehr in the back of his head. Both Rapport and Clark testified that Lehr did not threaten defendant in any way and the assault was unprovoked.

10

Lehr also testified. He explained that he was a manager of Rapport's other nearby property, the Roseville Hotel. Defendant lived in the Basic Apartments and worked at both properties doing maintenance. On the day of the altercation, Lehr was at the Roseville Hotel when he received a call from Clark, who was the general manager of both properties, and heard what he recognized as defendant's voice yelling, swearing, and threatening Clark in the background. Lehr told Clark that he would come over and try to help calm defendant down. When Lehr arrived, he told defendant to "leave [Clark] alone." He then turned away from defendant to "discuss the issue that was going on with [Clark]," and defendant punched him in the back of the head, causing him to fall to the floor.

Consistent with the testimony, Lehr can be seen in the security camera video entering the hallway, briefly speaking to defendant, and then turning away from defendant toward another man in the hallway. Defendant then punched Lehr in the back of the head, causing him to fall.[6]

Defendant testified that he had complained about the amplified music coming from the nightclub below his apartment, and Rapport came to his apartment to discuss how to remedy the problem. Defendant testified that during the conversation, Rapport became "irate" and the conversation moved to the hallway. During this verbal altercation, Clark walked out of his apartment and was a passive bystander initially but then began "looming" over defendant with a clenched fist. According to defendant, Lehr ran down the hallway toward him, got in his face, and told him, "Back the fuck up. Now

---

[6] The officer who investigated the Lehr assault was unavailable to testify at trial; however, the parties stipulated that if called to testify, he would state that he wrote a report indicating that Lehr ran into the hallway toward defendant just before the assault and Lehr stated to the officer that he told defendant "to back the fuck up right before being struck." However, the video shows Lehr walking, rather than running, toward defendant and the other two men.

11

you are dealing with a monster." Defendant testified that Lehr had turned past him and made a fist to hit him before Rapport grabbed his hand. At that point, defendant struck Lehr in the back of the head because he saw Lehr begin to swing his hand and felt threatened. Defendant testified that he pleaded to a count of disturbing the peace in the Lehr assault case at the beginning of trial.

**The Billy Assault**

The People presented the testimony of Christensen to establish the Billy assault. Christensen testified that two days prior to the charged assault against Homestead in this case, she saw a visitor she knew as Billy in the apartment building and observed that his eye was swollen shut and that he had "a real deep gash over his eye and the side of his face was all swollen." The injuries appeared fresh, and Christensen considered calling an ambulance for him. Based on her conversation with Billy, Christensen reviewed that day's security video of the hallway outside defendant's apartment. The security video showed a woman knock on defendant's door while Billy was with her and then defendant immediately came out of his apartment and "started wailing on Billy and he dropped on the ground and [defendant] was on top of Billy and just beating on him."[7] It did not appear to Christensen from the video that Billy had time to say anything to defendant before defendant began beating him. Christensen did not report the incident to the police because Billy told her he was on probation and did not want police involvement.

Defendant testified that on approximately January 18, 2012, he was in his apartment with his girlfriend, Diana Hockings, when they were disturbed by a knock at the door. Hockings then went to the door and saw that Billy, her ex-boyfriend, was there. Defendant had seen Billy around the Basic Apartments before but had not met him.

---

[7] On cross-examination, Christensen testified that Billy accompanied a woman defendant had been seeing to defendant's apartment to retrieve her things because the woman was afraid of defendant.

12

Defendant testified Hockings had told him that Billy beat her when they were dating. Hockings went into the hallway to talk to Billy for approximately two minutes, and she then returned to defendant's apartment. Shortly thereafter, defendant heard another knock at the door and answered himself. He asked Billy why he kept knocking on the door, and Billy told him that he would not leave without Hockings and that she had promised to give him a bottle of wine. After speaking to Hockings with the door closed, defendant then reemerged and told Billy to leave and that they did not have any wine for him. When Billy persisted in his demands, defendant threatened to call the police, and Billy responded that he would beat up defendant. Defendant then preemptively struck Billy after he observed Billy make a fist. Unlike Christensen's description of the video footage, defendant testified that the two men were in a mutual fight, hitting each other, and that he was not on top of Billy the entire time. He also testified that he saw Billy the next day and observed that Billy's eye was not swollen and merely had a small scratch on it.

### Uncharged Misconduct Jury Instructions

The trial court instructed the jury using CALCRIM No. 375, telling the jury that it could only consider the uncharged misconduct evidence for the limited purpose of determining defendant's intent and motive; it could not consider that evidence for any other purpose; and it could not conclude from this evidence that defendant has a bad character or is predisposed to commit crime. Further, the court instructed the jury that it could only consider the uncharged misconduct if it concluded that the People proved it by a preponderance of the evidence; that if the jury concluded defendant committed the uncharged misconduct, that conclusion is just one factor to consider along with the other evidence; and that that evidence is not sufficient by itself to prove defendant is guilty of the charged offenses.

## B. Analysis

Defendant asserts that the court erred in admitting the uncharged crime evidence because the probative value of the evidence was outweighed by its prejudicial effect and the presentation of the evidence required an undue consumption of time, confusing the jury and tempting the jurors to punish him for his past offenses.

As a general rule, section 1101, subdivision (a), prohibits the admission of evidence of uncharged misconduct to prove propensity or disposition to commit the charged crime. (§ 1101, subd. (a); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393(*Ewoldt*); *People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).) However, section 1101, subdivision (b), provides that such evidence is admissible "when relevant for a noncharacter purpose -- that is, when it is relevant to prove some fact other that the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake of fact or accident.' " (*Hendrix*, *supra*, 214 Cal.App.4th at p. 238.) " '[T]he admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other Section 352 concern).' " (*Id.* at p. 238.)

The trial court's determination of the admissibility of uncharged misconduct evidence is reviewed for abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) Such a discretionary decision will not be disturbed on appeal, absent " 'a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 (*Rodrigues*).) Because this is a very deferential standard of review, " 'discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

14

As we shall explain, the trial court did not abuse its discretion in admitting evidence of the Lehr and Billy assaults to establish intent and motive. The trial court weighed the probative value against the danger of undue prejudice, confusion of issues, and undue consumption of time and the court's ruling was not arbitrary, capricious, or patently absurd. (Cf. *Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.) In its ruling, the court reasoned that it had "not heard sufficient evidence to show that the incident would be unduly cumulative or prejudicial in its effect and…that the prejudicial effect would outweigh the potential probative value…."

We conclude that the evidence was material to key disputed facts in the case, highly probative of defendant's intent and motive, and its probative value was not "substantially outweighed by the probability that its admission [would]…create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Moreover, even if the court erred in admitting the evidence, any error was harmless because the other evidence against defendant was overwhelming.

### 1. Material Purpose

To satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact in the case or at least an intermediate fact from which an ultimate fact may be inferred. Elements of the offense, such as intent are ultimate facts. A defendant's motive is an intermediate fact. (*Hendrix*, *supra*, 214 Cal.App.4th at p. 240.)

The People offered the Lehr and Billy assaults for the non-character purpose of establishing defendant's intent to cause Homestead harm and to establish a motive of ruling the Basic Apartments by violence. To prove mayhem, the prosecution must prove that defendant acted maliciously. (Pen. Code, § 203) "[A]s used in section 203, the word 'maliciously' 'imports an intent to vex, annoy, or injure another person, or an intent to do a wrongful act.' " (*People v. Santana* (2013) 56 Cal.4th 999, 1007.) Thus, defendant's

15

intent to injure Homestead was an ultimate fact. His motive or reason for injuring Homestead was an intermediate fact.

For the purpose of deciding the materiality of evidence under section 1101, subdivision (b), a plea of not guilty places all of the elements of the offense in dispute, " 'unless the defendant has taken some action to narrow the prosecution's burden of proof.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 400, fn. 4, superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) In particular, "a fact -- like defendant's intent -- generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation…[and] remains 'disputed' until it is resolved." (*People v. Rowland* (1992) 4 Cal.4th 238, 260.) Since defendant did not stipulate to intent in this case, the matter was susceptible to proof by prior misconduct evidence. (*Ibid*; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 23; *People v. Balcom* (1994) 7 Cal.4th 414, 422.) Moreover, defendant's claim of self-defense placed in active dispute his motive or reason for striking Homestead.

## 2. Relevance and Probative Value

Uncharged misconduct evidence is relevant to prove intent if it is sufficiently similar to the charged act. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 392-403) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Id*. at p. 402.) " 'In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*Ibid*.)

The trial court did not abuse its discretion in finding the incidents were probative of material facts. As we have noted, to establish defendant's guilt as to the charge of mayhem, the prosecution had to establish, among other elements, that defendant intended to harm Holmstead. Additionally, given defendant's claim of self-defense, the prosecution had to disprove that motive or reason for striking Homestead. In his briefing, defendant concedes that the uncharged incidents were probative of his intent, but

16

contends the evidence was not probative of his motive. We agree that the evidence establishing the uncharged assaults did not demonstrate a motive to "rule" the apartment building. However, that evidence did tend to show a reason or motive for attacking Homestead and at the same time, refuted defendant's claim of self-defense. The evidence tended to show that defendant would rather have peace and quiet at the apartment building and is motivated to get back at people who he feels is responsible for or who have not addressed disturbances at the apartment building.

That defendant recently assaulted two other people outside his apartment door in response to noise issues in the building was highly probative on the issue of intent to injure and to refute his claim of self-defense. There is no question that the uncharged incidents were very similar to the charged offense and that defendant claimed self-defense in each instance while he was the common denominator. In all three incidents, the security videos showed defendant striking the victims in the hallway outside his apartment door, when there was no indication the victims were physically threatening defendant. In all three incidents, defendant responded violently because of perceived disturbances in his apartment building. In all three incidents, defendant claimed that he preemptively struck the victims in response to what he perceived as threatening behavior. Considering these shared characteristics, it could reasonably be inferred that defendant intended to injure Holmstead when he emerged from his apartment armed with the metal bar and that he never really believed he needed to defend himself. Consequently, the evidence tended in reason to prove the disputed fact that defendant intended to injure Holmstead and was highly probative of that fact because the jury could reasonably infer that defendant " ' "probably harbor[ed] the same intent in each instance." [Citation.]' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 402; see also § 210.) For the same reasons, the evidence was highly probative of motive and negated defendant's claim of self-defense. (*Id.* [" '[T]he recurrence of a similar result…tends (increasingly with each instance) to negative …self-defense…and tends to establish (provisionally, at least, though not

17

certainly) the presence of the normal, i.e., criminal, intent accompanying such an act….' ")

### 3. Prejudicial Effect and Other Evidence Code Section 352 Counterweights

At the heart of defendant's appeal is his contention that the evidence of the prior assaults was unduly prejudicial under section 352. Although he concedes that "the court may have been justified in admitting one uncharged assault," he contends the court erred in admitting evidence of both assaults because it prejudiced the jury against him, required a time-consuming "mini-trial" of the uncharged offenses, confused the jurors, and tempted the jury to punish him for his past conduct. We disagree with defendant's analysis.

"Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.) " 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " [citation].' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.) Stated another way, "[e]vidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) However, a defendant cannot merely complain that the uncharged misconduct evidence damages his case. " '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *which has very little effect on the issues*.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

18

In determining prejudicial effect, one factor courts look to is whether the evidence is inflammatory or likely to inflame the jury's passions. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405; *People v. Ortiz* (2003) 109 Cal.App.4th 104, 118.) Here, the proffered evidence of defendant's prior assaults was not inflammatory, particularly when examined in the context of the evidence of defendant's charged offense. The charged assault on Holmstead was by far the worst of the three incidents because defendant used a metal bar rather than his fist to inflict injuries in the charged assault, and Holmstead suffered the worst injuries of the three victims. The Lehr and Billy assaults were minor by comparison. Accordingly, there was no substantial danger that the evidence regarding the Lehr and Billy assaults would uniquely tend to evoke an emotional bias or inflame the jury's passions.

Defendant asserts that because he received a light punishment for the Lehr incident (disturbing the peace) and no punishment for the incident involving Billy, there was a danger the jury would convict him for the present crime to punish him for those prior acts of misconduct. We agree that whether a defendant received punishment for prior misconduct is a factor to be considered. (*Ewolt*, *supra*, 7 Cal.4th at p. 405.) However, here that factor did not result in a "substantial danger" of undue prejudice. Nor does this factor " 'substantially outweigh[]' " the probative value of the evidence. This is particularly true where, as here, the trial court appropriately admonished the jury to not consider the uncharged misconduct for any purposes other than those outlined in the instructions, namely intent and motive, and additionally twice instructed the jury, "You must reach your verdict without any consideration of punishment." Since defendant has failed to point to any indication in the record that the jury actually considered the evidence for an improper purpose, we must presume that the jury followed the court's instructions and did not consider punishing defendant for his past offenses. (See *People v. Aranda* (2012) 55 Cal.4th 342, 387-388.) Thus, we discern no prejudice related to the punishment defendant received or did not receive for the prior misconduct.

19

Defendant contends that the uncharged misconduct evidence required an undue consumption of time. We disagree. Here, the prosecution witnesses' testimony about the uncharged offenses was confined to approximately 32 trial transcript pages out of 142 pages of testimony. Additionally, according to the clerk's minutes, this testimony consumed only about an hour of a three-day trial. While defendant is correct that there were several more witnesses presented to testify about the uncharged misconduct than the charged offense, the record discloses that the People presented the testimony quickly, taking up little trial time. On this record, we simply cannot conclude that the uncharged misconduct evidence created a "mini-trial" that resulted in an *undue* consumption of time.

Defendant argues that the evidence "undoubtedly confused the jury," but there is no indication in the record that the jury was confused. The jury did not pose any questions about the uncharged misconduct evidence during its deliberations. Additionally, any risk of confusion was negated by the trial court's clear instructions on the proper and improper uses of the evidence. The court carefully instructed the jury on reasonable doubt and the necessity of proof as to each of the charged counts. The court specifically instructed: "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove every charge beyond a reasonable doubt." Furthermore, the acquittal on the charge of possession of a billy shows that the jury gave consideration to the charges without being confused or inflamed by the uncharged misconduct evidence. Defendant's claim that the jury was likely confused by the uncharged misconduct evidence is speculative at best.

In sum, defendant has not shown that the trial court exercised its discretion under sections 1101, subdivision (b), and 352 in an arbitrary, capricious, or patently absurd

20

manner in admitting evidence of the prior assaults. (Cf. *Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

### 4. Harmless Error

While we do not find error in this case, we note that even if the trial court erred in admitting the uncharged misconduct evidence, any error was harmless. A reviewing court need only reverse an error in admitting section 1101 evidence if it is "reasonably probable" that an outcome more favorable to defendant would have resulted had the evidence not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836; accord *People v. Malone* (1988) 47 Cal.3d 1, 22; *People v. Leon* (2008) 161 Cal.App.4th 149, 169.) On this record, it is not reasonably probable that a result more favorable to defendant would have been reached had the jury not learned that defendant similarly assaulted people outside his apartment door on two prior occasions.

The evidence against defendant on the charged offense was overwhelming. Consistent with Holmstead's testimony, the security video showed that defendant approached Holmstead quickly and without physical provocation, struck him multiple times with a metal bar, and then chased Holmstead down the hallway while he was running away. The video did not show Holmstead behaving aggressively or banging on the walls as defendant described in his testimony. Defendant testified that he was "scared to death" because he thought he saw that Holmstead had a knife in one hand when he looked through his peephole, yet he ran out of his apartment aggressively instead of staying inside with the door locked or calling the police. Defendant testified that he "tapped" Holmstead on the leg with the metal bar as "a warning," yet the video shows that defendant's first blow was very hard.

In sum, the security video was substantially consistent with Holmstead's account of the assault and inconsistent with defendant's account. Additionally, defendant lied to Officer Reno that he hit Holmstead with his fist rather than a weapon, and he never said anything to the officer about Holmstead having a weapon or that he feared for his safety.

21

It was also clear from the video, testimony, and physical evidence that the altercation was incredibly one-sided; defendant suffered no injuries while Holmstead was severely injured as a result of the multiple blows inflicted by defendant with the metal bar. On these facts, we cannot conclude that it was "reasonably probable" that defendant would have obtained a more favorable result if the court had not admitted the uncharged misconduct evidence.

## II. Restitution Order

At sentencing, the court initially ordered defendant to pay $20,847.89 in restitution to Homestead, which represented his medical costs. The abstract of judgment reflects this restitution order. Later, the prosecution filed a motion to vacate the restitution order and hold restitution in abeyance to allow Homestead to seek funds from the VCP on the grounds that defendant was indigent and unlikely to pay restitution. Defendant did not object, and the trial court granted the motion on July 13, 2012. However, the court did not amend the abstract of judgment to reflect that payment of restitution to the victim was held in abeyance.

Defendant contends that the abstract of judgment must be amended to accurately reflect the trial court's order to hold the $20,847.89 victim restitution order in abeyance. Respondent agrees.

The People's concession does not take defendant off the hook. If the VCP has paid or will pay for Homestead's medical expenses, defendant must reimburse the program. Accordingly, the trial court must determine if the VCP has made any payments on behalf of Homestead, and if so, order defendant to reimburse the California Victim Compensation and Government Claims Board for payments made from the program. (Pen. Code, § 1202.4, subd. (f)(2).) If Homestead's claim to the VCP was denied or he never applied for funds from the VCP, the trial court shall reinstate the original restitution order.

22

## DISPOSITION

We remand this case to the trial court to determine whether the VCP has made any payments on behalf of the victim, and if so, order defendant to reimburse the California Victim Compensation and Government Claims Board for those payments as required by Penal Code section 1202.4, subdivision (f)(2), and amend the abstract to reflect this new order. If the VCP has declined the victim's claim or the victim did not seek funds from VCP, the trial court must reinstate its original order that defendant pay $20,847.89 to the victim.

In all other respects, the judgment is affirmed.

                                                            MURRAY        , J.

We concur:

       ROBIE     , Acting P. J.

       DUARTE   , J.